ESTATE OF HOEPPNER: BORNFLETH and others, Appellants,
v. HOEPPNER, Executor, Respondent.

*October 3—November 1, 1966.*

340

For the appellants Arthur and Harry Bornfleth there were briefs by *Lowry, Hunter & Tikalsky,* and oral argument by *Thomas E. Anderson,* all of Waukesha.

*Thomas S. Brenner* of Waukesha, guardian *ad litem* for the appellant John Hoeppner, joined in certain of the arguments in the briefs of appellants Bornfleth and the respondent, and also argued.

For the respondent there was a brief by *Bertram & Bertram* of Milwaukee, and oral argument by *Daniel E. Bertram.*

HEFFERNAN, J.

*Did Elsie and Emil enter into a contract*
*to make a will?*

In *Schwartz v. Schwartz* (1956), 273 Wis. 404, 411, 78 N. W. (2d) 912, following the principle established in *Doyle v. Fischer* (1924), 183 Wis. 599, 198 N. W. 763, we adopted the rule stated in 169 A. L. R. 9, 69, as follows:

"A will which is jointly executed may furnish in itself prima facie proof that it was executed pursuant to a contract between the testators, notwithstanding it does not expressly purport to have been made pursuant to contract, does not contain the word 'contract' or 'agreement,' or include an express promise that the survivor will carry out the dispositions contained in the will."

This court in *Doyle v. Fischer, supra,* pages 607 and 608, pointed out that:

"A pre-existing contract to make mutual and reciprocal wills may be conclusively inferred from the provisions of the wills themselves (especially if they be joint) in the light of circumstances existing at the time the wills were executed [citing authorities]. . . .

"The fact that these wills constitute but a single document, that they were executed at the same time, that each of the testators knew of the provisions made·in the will of the other, that some of the children were provided for by one, and the others by the other [a factor later determined in *Schwartz v. Schwartz, supra,* p. 411, to be not controlling] testator, conclusively indicates that the two wills resulted from a mutual agreement between the testators . . . ."

We recognize that the *Doyle-Schwartz* rationale of determining the contractual genesis of a will is not universally accepted. Sparks, Contracts to Make Wills (1956), p. 28, cites *Doyle* as a minority (and inferentially unsound) position. He states:

"It is sometimes said that joint wills, that·is to say the wills of two or more persons executed on one piece of paper as the will of each of them, having reciprocal provisions constitutes stronger evidence of a contract than do similar provisions contained in two separate documents. The use of such pronouns as 'we,' 'our,' and 'us' in joint wills is often said to be indicative of a contract, especially where the property being disposed of is held by entireties or where it is referred to as joint property though actually held in severalty. Such language should be taken as nothing more than the normal and natural usage of two people attempting to execute two wills as one document. It indicates that they have talked over

their testamentary plans and have agreed upon a certain scheme of disposition, but is completely silent as to whether or not a contract has been entered into. Such has been the position of the better reasoned opinions."

Whatever infirmities are believed to exist in the *Doyle-Schwartz* rationale, nevertheless this jurisdiction is, on the basis of *stare decisis*, committed to it.[1]

We conclude therefore that the language of the joint reciprocal wills of 1948 and 1949, though containing no contractual language, does give rise to the conclusive inference that they were executed pursuant to a preexisting agreement that was contractual in nature. Under these circumstances, it cannot be said that the finding of the trial court was contrary to the great weight and clear preponderance of the evidence.

While this court holds that a joint reciprocal will, as executed by the Hoeppners, may give rise to the conclusive inference that the will was executed pursuant to a contract, we do not hold that the substance of that preexisting contract is embodied in the provisions of the will. The contract whose existence we infer is merely the "bare bones" contract to make mutually agreeable and acceptable wills.

We accordingly conclude that, though the contract inferentially exists, the contract is satisfied by the parties either executing wills that are mutually agreeable or by revoking existing wills for the same purpose. The contract that under these circumstances we find by inference is precisely like the express contract of the parties in *Pederson v. First Nat. Bank* (1966), 31 Wis. (2d) 648, 652, 143 N. W. (2d) 425, which provided, "It is . . . agreed . . . that these Wills will not be changed unless

---

[1] Legislative recognition of the unique status of joint wills appears in sec. 238.19, Stats.:

"No will shall be construed as contractual unless such fact affirmatively appears in express language on the face of the instrument. This section shall not apply to joint wills which exist as a single document."

it is mutually agreeable to each party." We pointed out, at page 655, that, "The plain meaning of the contract was that the wills could be changed at any time in a manner that might be mutually agreeable to the parties . . . ." We therefore conclude that the 1948 will was revoked and replaced with the 1949 will in accordance with the only provision of the parties' prior contract that can be conclusively inferred, *i.e.*, the provision to make mutually agreeable wills. The 1949 will was the last will that was mutually agreed upon by the parties.

Elsie Hoeppner died in 1959 without executing another will. We stated in *Schwartz v. Schwartz, supra,* page 410:

"After one of the two testators has died it is beyond his power to consent to the survivor modifying or revoking the testamentary disposition which had been agreed was to take place upon the death of the survivor."

The terms of the testamentary disposition of 1949 may, therefore, be enforced in equity. The execution of a subsequent will, not being in conformance with a mutually agreed upon disposition, constituted a breach of contract.

Respondent, however, takes the position that Emil Hoeppner need not be bound by the 1949 disposition since the will of Elsie was not probated and he took Elsie's interest in the real estate as a surviving joint tenant.

The trial court, while determining that the agreement was contractual, reviewed *Doyle v. Fischer, supra,* and *Schwartz v. Schwartz, supra,* and concluded the rule controlling in this case was the statement in *Schwartz v. Schwartz, supra,* page 409:

" 'It is the duty of equity to grant such relief where, as here, the survivor of the two testators to a joint will or to two mutually reciprocal wills, has directly benefited from the will of the first of such two testators to die *by receiving property thereunder to which the [such] survivor would not otherwise have been entitled.*' " (Emphasis by trial court.)

To reaffirm, as we do, the above statement appearing in *Schwartz* does not necessitate our concurrence in re-

spondent's argument for the converse: "Equity will not grant relief if the survivor does not receive property under the contract." The important fact is that Emil got what he bargained for. Elsie died leaving in force a will that was agreeable to Emil (as well as to Elsie). This was what he contracted for and this is what he got. He got the benefit of his bargain. Hence, we conclude that, even under the test relied upon by the trial court and urged by the respondent, the survivor was benefited. Alternative dispositions of Elsie's interest in the joint property were foreclosed by her adherence to the contract to make a mutually agreeable will and her death leaving such a will in force.

We also conclude that the language of *Schwartz* relied upon by the trial court is more appropriate where there is an oral agreement to will real estate contrary to the statute of frauds, and the first to die has carried out the agreement. We have recognized that, under those circumstances, equity will not permit the statute to be used to work a fraud where there has been such a change in position of one of the parties that enforcement of the statute of frauds would result in injustice and hardship. See *Estate of Rogers* (1966), 30 Wis. (2d) 284, 140 N. W. (2d) 273. Such is not the case here. There is no oral contract to devise real estate. The contract is merely to make a mutually agreeable will. The execution of the 1962 will, providing for a disposition different than that agreed upon in the will of 1949, breached that contract, and equitable relief is appropriate.

We also conclude that the rights of the beneficiaries arise solely under the will and not under the contract. We pointed out in *Estate of Cochrane* (1961), 13 Wis. (2d) 398, 108 N. W. (2d) 529, that beneficiaries could acquire irrevocable rights only by contract and not by will for a will is always subject to revocation even if pursuant to a contract. See also *Pederson v. First Nat. Bank, supra,* page 656.

In *Cochrane* we discussed the doctrine of *Tweeddale v. Tweeddale* (1903), 116 Wis. 517, 93 N. W. 440, which established that contracting parties whose contract has provided benefits to a third party may not revoke such benefits without the consent of the third-party beneficiary. We said:

> "*Tweeddale* goes no further than to protect the third party's rights established by the original agreement. . . .
> "In all the Wisconsin cases called to our attention where this court has discussed the inviolability of the original contract, the third-party beneficiary has been attempting to preserve the rights given him by contract and those are the rights which we have protected. We do not find that we have ever attempted to say, as appellant wishes us to, that the contracting parties may not by agreement do as they please in altering the original terms so long as they do not alter the beneficiary's rights without his consent. We conclude that the contracting parties have that right of modification as between themselves as in other contracts." *Estate of Cochrane, supra,* page 402.

The contract to make a will in a manner agreeable to Emil and Elsie conferred no right on third parties. It is this contract that *Cochrane* refers to as the "original" contract. It is obvious that no rights vest in the claimants upon the making of that agreement. The rights of the claimants arise from the will of 1949 and only become fixed and irrevocable (the rights, not the will) upon the death of Elsie Hoeppner. It is this last mutually agreeable will that binds the hand of Emil Hoeppner and determines the disposition of the estate of Emil Hoeppner in a court of equity.

This case well illustrates the uncertainties that can arise when a testamentary disposition is made by a joint will that is apparently or inferentially contractual in nature but fails to say so specifically and in which there is no reference to a separate contract. The following caveat appears in Sparks, Contracts to Make Wills (1956), p. 192:

"When it is remembered that in most instances by the time action is brought to enforce a contract to make a will the promisor is dead and the promisee is faced with the restrictions imposed by the various 'dead man statutes' as well as the requirement that the contract be proved by clear and convincing evidence, the importance of always putting the contract into writing becomes apparent. Joint and mutual wills are such uncertain quantities that they should never be executed without a full and complete declaration on their face as to whether they are or are not executed pursuant to contract. This suggestion is especially applicable to joint wills, devices that should be discouraged wherever possible since the desired results can be just as easily obtained and the intention of the parties more clearly expressed in separate instruments."

In summary, Sparks, *supra,* page 200, points out:

"A contract to make a will is a contract and the interests created by it must be analyzed according to contract principles. It is a device born out of a social need for which there appears no other satisfactory answer and its skillful use is a responsibility of the legal profession. It is an arrangement for devolution of property but it is materially different from a will in that it is not ambulatory. While a will has no effect until death of the testator and is freely revocable until that time a contract has immediate effect and cannot be rescinded unilaterally without incurring a liability for breach of contract. A contract to make a will is not a proper instrument to use unless the promisor is ready to make a final and irrevocable commitment for the disposition of his property, but if it is always understood as an arrangement of this type it can be a useful tool in every estate planner's kit."

*By the Court.*—Judgment reversed, with directions to enter judgment for the claimants consistent with this opinion.

GORDON, J. (*concurring*). I subscribe to the court's decision because of the dictates of *stare decisis*, notwithstanding my doubts as to the wisdom of the rule which we now confirm. The dilemma which we face is comparable to that commented upon by Aristotle, when he said in

Rhetoric, bk. 1, ch. 15: "Trying to be wiser than the laws is just what is forbidden by those codes of law that are accounted best."

The results of our holding this to be a joint contractual will are so drastic that a sounder rule, in my opinion, would require clear-cut proof that a contract was actually intended. Take the following example: If a young husband and wife sign a joint will when they are about twenty-five years of age and then one of them dies, the survivor is bound (even if he or she lives another fifty years) and must leave all of his or her property exactly as required by the joint will. In other words, the concrete, once poured, is permanently set; neither remarriage, the birth of new children, or other major changes can alter it. The vicissitudes of life are such that it would seem more sensible to me that we ought not to presume such an intent unless the parties clearly declare it.

A contrary result in the case at bar might well be urged not only in the name of good sense but also by bearing down on our statement in *Estate of Schley* (1955), 271 Wis. 74, 79, 72 N. W. (2d) 767, where this court said:

"There is no evidence that there were any contractual provisions in the will itself, and a joint or mutual will lacking contractual elements may be revoked at any time by either testator in the same manner as other wills."

The *Schley Case* did not cite *Doyle v. Fischer* (1924), 183 Wis. 599, 198 N. W. 763. *Schwartz v. Schwartz* (1956), 273 Wis. 404, 78 N. W. (2d) 912, was decided one year after *Estate of Schley,* and both *Schwartz* and *Doyle* appear to be squarely in point, as the majority opinion, written by Mr. Justice HEFFERNAN, convincingly demonstrates.

The policy followed in the instant decision can, of course, be remolded by the legislature. If our reluctant adherence to a dubious rule is deemed misguided, corrective legislation should be undertaken. For example, a reversal of policy could be indicated by a repeal of the

last sentence of sec. 238.19, Stats. That section now provides as follows:

"No will shall be construed as contractual unless such fact affirmatively appears in express language on the face of the instrument. *This section shall not apply to joint wills which exist as a single document."* (Emphasis added.)

In the field of wills, it is probably more important that the rule be certain than that it be right. Nevertheless, one must acknowledge the wisdom of the observation made by Dean Pound in Interpretations of Legal History (1923), 1: "Law must be stable and yet it cannot stand still."

I am authorized to state that Mr. Justice BEILFUSS joins in this concurring opinion.